**PERKINS COIE LLP**
Eric J. Weiss, *pro hac vice*
EWeiss@perkinscoie.com
Mallory A. Gitt, *pro hac vice*
MGitt@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: 206.359.8000
Facsimile: 206.359.9000

Gillian C. Kuhlmann, Bar No. 316241
GKuhlmann@perkinscoie.com
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Lauren Trambley, Bar No. 340634
LTrambley@perkinscoie.com
505 Howard Street, Suite 1000
San Francisco, California 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
Victor Jih, Bar No. 186515
vjih@wsgr.com
Kelly H. Yin, Bar No. 328380
kyin@wsgr.com
1900 Avenue of The Stars, 28th Floor
Los Angeles, CA 90067
Telephone: 424.446.6900
Facsimile: 866.974.7329

Dylan G. Savage, Bar No. 310452
dsavage@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: 212.999.5800
Facsimile: 866.974.7329

Attorneys for Defendant Roku, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

E.A.R.R., et al.,

Plaintiffs,

v.

ROKU, INC.,

Defendant.

Case No. 5:25-cv-02474-JGB-DTB

**DEFENDANT ROKU, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION**

Date: December 29, 2025
Time: 9:00 a.m.
Judge: Hon. Jesus G. Bernal
Crtm: 1

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT ON December 29, 2025, at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 1, 2nd Floor, United States District Court for the Central District of California, located at 3470 Twelfth Street, Riverside, California 92501, Roku, Inc. ("Roku") will move to compel arbitration. This Motion is made pursuant to the Federal Arbitration Act. 9 U.S.C. § 4.

This Motion is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Julian Riediger and Eric J. Weiss in Support of Roku's Motion to Compel Arbitration and accompanying exhibits, other applicable portions of the record, and other argument that may be presented to the Court. This Motion is made following the conferences of counsel pursuant to Local Rule 7-3, which took place by email and phone on September 16, October 22, and November 18, 2025.

Dated: November 25, 2025

**PERKINS COIE LLP**

By: *s/ Eric J. Weiss*

Eric J. Weiss, *pro hac vice*
Mallory A. Gitt, *pro hac vice*
Gillian C. Kuhlmann, Bar No. 316241
Lauren Trambley, Bar No. 340634

Attorneys for Defendant Roku, Inc.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 7

II. BACKGROUND .......... 8

A. Roku accountholders agree to mandatory arbitration. .......... 8

B. Plaintiffs are using their mother's Roku account to access Roku devices and services. .......... 11

C. Plaintiffs filed a putative class action in court. .......... 12

III. LEGAL STANDARD .......... 12

IV. ARGUMENT .......... 13

A. A valid agreement to arbitrate exists. .......... 13

1. Courts routinely enforce clickwrap agreements like Roku's. .......... 13

2. Plaintiffs' mother agreed to arbitrate disputes with Roku. .......... 13

B. Well-established equitable doctrines require Plaintiffs to arbitrate. .......... 14

1. Preexisting-relationship estoppel: Plaintiffs have a preexisting relationship with their mother, the Roku accountholder. .......... 15

2. Direct-benefits estoppel: Plaintiffs received direct benefits by using their mother's account. .......... 16

3. Intertwined-claims estoppel: Plaintiffs' claims are intertwined with their mother's agreement with Roku. .......... 18

C. Equity and the FAA's policy compel the same result. .......... 19

D. Arbitrability is delegated to the arbitrator. .......... 20

1. The terms delegate arbitrability to the arbitrator. .......... 20

2. Even if the terms did not delegate arbitrability, Plaintiffs' claims fall squarely within the agreement. .......... 21

V. CONCLUSION .......... 23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 7, 12, 19

*Atencio v. Bird Rides Inc.*,
2023 WL 8168955 (C.D. Cal. Nov. 3, 2023) .......... 17

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 13

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 20, 21

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) .......... 20

*Chan v. Charter Commc'ns Holding Co.*,
2015 WL 12655701 (C.D. Cal. Aug. 6, 2015) .......... 15, 16, 21

*Charles v. Portfolio Recovery Assocs., LLC*,
2024 WL 1672350 (9th Cir. Apr. 18, 2024) .......... 21

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 12, 20

*Corn v. Kohl's Corp.*,
2025 WL 1785943 (N.D. Cal. June 9, 2025) .......... 17

*Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*,
158 Cal. App. 4th 1061 (2008) .......... 15

*Ferguson v. Age of Learning, Inc.*,
2021 WL 4735736 (C.D. Cal. July 23, 2021) .......... 13

*Gurler v. Westpac Surgical, LLC*,
2020 WL 10317436 (C.D. Cal. Dec. 11, 2020) .......... 14

*Hawkins v. Ford Motor Co.*,
2021 WL 9031130 (C.D. Cal. Nov. 24, 2021) .......... 12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 12, 20, 21

*Hofer v. Emley*,
2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) .......... 17

*Ishimaru v. Fung*,
2005 WL 2899680 (Del. Ch. Oct. 26, 2005) .......... 14

*Jackson v. Amazon.com, Inc.*,
559 F. Supp. 3d 1132 (S.D. Cal. 2021) .......... 13

*Knapke v. PeopleConnect, Inc.*,
38 F.4th 824 (9th Cir. 2022) .......... 22

*Marcos v. T-Mobile USA, Inc.*,
2024 WL 5673416 (C.D. Cal. July 10, 2024) .......... 21

*Montoya v. Comcast Corp.*,
2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) .......... 18, 19

*Motise v. America Online, Inc.*,
346 F. Supp. 2d 563 (S.D.N.Y. 2004) .......... 16

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
922 A.2d 417 (Del. Ch. 2007) .......... 17

*Newell Rubbermaid Inc. v. Storm*,
2014 WL 1266827 (Del. Ch. Mar. 27, 2014) .......... 13

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) .......... 16

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 13, 14

*Pearl v. Coinbase Glob., Inc.*,
2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) ....................20

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010)....................20

*S.G. v. Epic Games, Inc.*,
2025 WL 2447456 (N.D. Cal. Aug. 26, 2025) ....................15, 16, 20

*Simple Traditions, Inc. v. Paychex, Inc.*,
2024 WL 4957225 (E.D. Cal. Dec. 3, 2024) ....................17, 18

*Smith v. Spizzirri*,
601 U.S. 472 (2024)....................12

*Yeh v. Tesla, Inc.*,
2023 WL 6795414 (N.D. Cal. Oct. 12, 2023) ....................16, 17, 18, 20

**STATUTES**

9 U.S.C. § 4....................2, 12

**OTHER AUTHORITIES**

AAA Consumer Arbitration Rules and Mediation Procedures, Rule 7 ....................11

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Enforcement of arbitration agreements matters because it ensures that disputes are resolved in the forum the parties choose. This motion presents a straightforward application of that principle. When parents agree to arbitrate disputes related to products and services they bring into their home and for their children's benefit, claims brought by their children arising from those products and services must be resolved through arbitration as the parents agreed.

Plaintiffs allege that they are children who accessed Roku products and services through their mother's Roku account. When their mother created her account, she agreed to Roku's terms, including an agreement to arbitrate all disputes related to her account and to the devices and services accessed through her account. Plaintiffs now seek to litigate claims that exist solely because they accessed their mother's Roku account. Their position—that they may enjoy the benefits of their mother's account while avoiding its corresponding obligations—contradicts both settled law and established principles of fairness and equity.

Courts have long recognized that non-signatories to arbitration agreements, like Plaintiffs, are required to arbitrate when any of three independent equitable-estoppel doctrines applies: (1) a preexisting relationship exists between the signatory and non-signatory, (2) the non-signatory directly benefits from the agreement, or (3) the claims are intertwined with the agreement's terms. Each doctrine independently applies here. Plaintiffs accessed Roku's services through their mother's account, enjoyed the services and content made possible by that account, and now seek to assert claims that presuppose and depend on its existence.

Equity and fairness require Plaintiffs to honor their mother's choice to arbitrate. So too does the Federal Arbitration Act. The FAA codifies a "national policy" to enforce arbitration agreements "according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344,

346 (2011). That mandate reflects a basic fairness: contractual benefits and burdens must be equally enforced. Allowing Plaintiffs to proceed in court would invite mischief and reward artful pleading that undermines the predictability and certainty that modern commerce demands. Equity, fairness, and the FAA foreclose that result.

Accordingly, this Court should enforce the arbitration agreement and grant Roku's motion to compel.

## II. BACKGROUND

### A. Roku accountholders agree to mandatory arbitration.

Roku streaming sticks and Roku TVs are Internet-connected devices. Declaration of Julian Riediger in Support of Roku Motion to Compel Arbitration ("Riediger Decl.") ¶ 2. A Roku account is necessary to activate and use the streaming functionality of these devices. *Id.*

Roku has required individuals creating a Roku account to check a box confirming their agreement to Roku's terms since at least February 2015. *Id.* ¶ 3. For example, the account-creation webpage currently provides notice that Roku's terms apply, requiring individuals to check a box stating, "I agree to the Terms and Conditions. I have read the Privacy Policy and California Privacy Notice." *Id.* ¶ 4, Ex. A. The terms are accessible via a visually distinct blue, underlined hyperlink adjacent to the checkbox, allowing individuals to review the full terms before proceeding. *Id.*

An individual cannot create a Roku account without checking the box and agreeing to the terms. If they attempt to continue without checking the box, an error message would appear, like the one shown below: "To create a Roku account, you must agree to the Roku Terms and Conditions." *Id.* ¶ 5, Ex. B.




For more than a decade, Roku's terms have included a mandatory arbitration provision with a class-action waiver. *Id.* ¶ 7, Ex. D at § 1.E; *id.* ¶ 8, Ex. E at p.1; *id.* ¶ 9, Ex. F at p.5. Throughout this period, Roku's arbitration provision has specified that claims arising out of or relating to any Roku account, Roku's products and services, and any use thereof must be resolved exclusively through arbitration and that disputes can only be brought on an individual basis, not in a class action.[1] *Id.* Moreover, through explicit delegation language and incorporation of the rules of the chosen arbitral forum, the terms have for the last decade granted arbitrators the authority to decide all issues of arbitrability. *Id.*

Roku's Dispute Resolution Terms were most recently updated in February 2024. To continue using the streaming functionality of Roku devices, accountholders were required to affirmatively assent to the updated terms. *Id.* ¶¶ 10–11, Ex. G.




[1] The only claims not subject to arbitration are not at issue here: intellectual-property claims, claims brought in small-claims court, and claims seeking a temporary restraining order.

Roku also notified accountholders of this update via email. *Id.* ¶¶ 12–13, Ex. H.

> **Roku**
>
> Dear [redacted],
>
> We wanted to let you know that we have made changes to our Dispute Resolution Terms, which describe how you can resolve disputes with Roku. We encourage you to read the updated Dispute Resolution Terms. By continuing to use our products or services, you are agreeing to these updated terms.
>
> Thank you for making Roku part of your entertainment experience,
>
> The Roku Team

The 2024 Dispute Resolution Terms make clear: "READ THESE DISPUTE RESOLUTION TERMS CAREFULLY." *Id.* ¶ 7, Ex. D at § 1. They re-confirm that the requirement to arbitrate applies to a broad set of claims:

> any dispute, claim, cause of action, or controversy between you and Roku, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, that arises from or relates to your Roku account, any of our products, software, or services (including any devices linked to your Roku account, whether or not owned by you), any advertising or promotions conducted by or for Roku, or any use or disclosure of your information or information about you, or claims related to the arbitrability, validity, enforceability, or scope of any Roku consumer terms and conditions between you and Roku (including these Dispute Resolution Terms) or any portion of them.

*Id.* ¶ 7, Ex. D at § 1.A.

The 2024 Dispute Resolution Terms incorporate the American Arbitration Association's Consumer Arbitration Rules and, consistent with previous terms, provide that "the arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity." *Id.* ¶ 7, Ex. D at § 1.E. The AAA's Consumer Arbitration Rules similarly provide that "[t]he arbitrator

shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of any claim or counterclaim." AAA Consumer Arbitration Rules, R7(a).[2]

Individuals who do not wish to commit to arbitration may decline to create an account or accept the terms and opt out of arbitration in writing within 30 days of first agreeing to the Dispute Resolution Terms. *Id.* ¶ 7, Ex. D at § 1.L.

### B. Plaintiffs are using their mother's Roku account to access Roku devices and services.

Plaintiffs allege that they "have access to, and use multiple Roku enabled devices through their Guardian's Roku account, including a Roku streaming stick and multiple Roku TVs." Compl. ¶ 48. Plaintiffs submitted applications for appointment of a guardian ad litem identifying their mother, Lynette Gonzalez, as their guardian. ECF Nos. 1-6, 1-7. Ms. Gonzalez, through whom Plaintiffs bring this lawsuit, agreed to arbitrate on an individual basis any claim arising out of or relating to her Roku account and devices. Roku's records do not include any opt-out request submitted for Ms. Gonzalez. Riediger Decl. ¶ 14.

Plaintiffs allege that Roku collected and disclosed their personal information during their use of multiple Roku devices, including a streaming stick and multiple Roku TVs, all accessed through "shared household TVs" and their mother's Roku account. Compl. ¶¶ 3, 48, 50. Plaintiffs allege violations of the Children's Online Privacy and Protection Act, which they contend subjects Roku to liability under the Electronic Communications Privacy Act and the California Invasion of Privacy Act. *Id.* ¶ 46.

---

[2] American Arbitration Association, Consumer Arbitration Rules and Mediation Procedures, https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf (May 1, 2025).

**C. Plaintiffs filed a putative class action in court.**

Plaintiffs filed this action in California state court on behalf of a putative nationwide class and California subclass. ECF No. 1-3. Roku removed the action to this Court under federal-question jurisdiction and Class Action Fairness Act jurisdiction. ECF No. 1. To save the Court and the parties time and expense, the parties agreed to sequence the initial briefing to allow the parties and the Court to address whether arbitration is required before they address other non-arbitration issues, if necessary. ECF Nos. 25, 26.

## III. LEGAL STANDARD

Roku moves to compel arbitration under Section 4 of the Federal Arbitration Act ("FAA"). 9 U.S.C. § 4. The FAA embodies a "national policy favoring arbitration," and courts are directed to enforce arbitration agreements "according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility*, 563 U.S. at 344, 346; *see also Hawkins v. Ford Motor Co*., 2021 WL 9031130, at *2 (C.D. Cal. Nov. 24, 2021) (Bernal, J.) ("The FAA establishes a general policy favoring arbitration agreements").

On a motion to compel arbitration, the court's inquiry is limited to two threshold questions: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000). But if the court determines that a valid agreement to arbitrate exists and the parties delegated to the arbitrator resolution of the second condition (i.e., scope), as is the case here, then the court may not decide whether the agreement encompasses the dispute at issue and must compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Smith v. Spizzirri*, 601 U.S. 472, 476–78 (2024) (requiring stay of court action if arbitration is compelled).

## IV. ARGUMENT

### A. A valid agreement to arbitrate exists.

#### 1. Courts routinely enforce clickwrap agreements like Roku's.

Courts routinely enforce "clickwrap" agreements—like Roku's terms—when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023).[3] And courts consistently find a binding clickwrap contract where, as here, the terms are hyperlinked, clearly labeled, and acceptance is required to proceed. *See, e.g.*, *Ferguson v. Age of Learning, Inc.*, 2021 WL 4735736, at *5 (C.D. Cal. July 23, 2021) (Bernal, J.) ("The first type of Internet agreement, clickwrap, clearly forms a valid contract. In a clickwrap agreement, the user affirmatively checks a box agreeing to the terms and conditions.").

#### 2. Plaintiffs' mother agreed to arbitrate disputes with Roku.

Plaintiffs' mother, Ms. Gonzalez, created a Roku account and affirmatively agreed to Roku's terms, which require arbitration of all disputes. During the account-

---

[3] California or Delaware law applies here because Plaintiffs allegedly are residents of California and Roku is headquartered in California, and Roku is a Delaware corporation and its current Dispute Resolution Terms call for application of Delaware law. Compl. ¶¶ 11–12; Riediger Decl. ¶ 7, Ex. D at § 3. There is no material difference between the applicable law of those jurisdictions. *See Jackson v. Amazon.com, Inc.*, 559 F. Supp. 3d 1132, 1138 (S.D. Cal. 2021) ("The laws of contract formation of Washington, Delaware, and California law are materially the same . . . . The Court applies California law to determine the applicable agreement but would reach the same result under Washington or Delaware law."), *aff'd*, 65 F.4th 1093 (9th Cir. 2023); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022) (applying California law and holding that "courts have routinely found clickwrap agreements enforceable"); *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *1 (Del. Ch. Mar. 27, 2014) ("[T]he Court concludes that clickwrap agreements . . . are enforceable under Delaware law.").

creation process, she received conspicuous notice of and access to the terms via a blue hyperlink, allowing her to review the full text. *See* Riediger Decl. ¶ 4, Ex. A. She then affirmatively checked the box stating, "I agree to the Terms and Conditions." *Id.* She could not have created her account and used Roku devices and services without checking the box confirming her agreement. *Id.* ¶ 5, Ex. B. This meets both requirements for an enforceable clickwrap agreement: (1) reasonably conspicuous notice of the terms, and (2) an unambiguous manifestation of assent. *See Oberstein*, 60 F.4th at 515.

Ms. Gonzalez also had multiple opportunities to decline arbitration: she could have declined to create a Roku account, or she could have opted out of arbitration within 30 days while continuing to use Roku products and services. Riediger Decl. ¶ 7, Ex. D at § 1.L. She did neither. *Id.* ¶ 14. Ms. Gonzalez therefore agreed to arbitrate disputes arising out of or relating to her Roku account and devices.

**B. Well-established equitable doctrines require Plaintiffs to arbitrate.**

Plaintiffs' claims arise solely from their use of Roku devices and services through their mother's Roku account, Compl. ¶ 48, which is governed by Roku's terms and arbitration requirement. That is important because even though Plaintiffs themselves may not have checked the box agreeing to Roku's terms, under well-established equitable doctrines, courts require non-signatories like Plaintiffs to arbitrate their claims when any of the following is true: (1) a preexisting relationship exists between the signatory and non-signatory, (2) the non-signatory directly benefited from the agreement, or (3) the claims are intertwined with the agreement's benefits and obligations.

Each of these independent doctrines requires arbitration here. *See, e.g.*, *Gurler v. Westpac Surgical, LLC*, 2020 WL 10317436, at *2 (C.D. Cal. Dec. 11, 2020) (explaining that a "nonsignatory may be compelled to arbitrate under principles of equitable estoppel."); *Ishimaru v. Fung*, 2005 WL 2899680, at *18 n.47 (Del. Ch. Oct. 26, 2005) ("The various legal and equitable principles (e.g., agency, veil

piercing, equitable estoppel, assumption by conduct) that can be deployed to require a signatory to arbitrate with a non-signatory can also be used to require a non-signatory to arbitrate with a signatory.”).

**1. Preexisting-relationship estoppel: Plaintiffs have a preexisting relationship with their mother, the Roku accountholder.**

Courts routinely hold that non-signatories are bound to arbitrate when a “preexisting relationship exist[s] between the nonsignatory and one of the parties to the arbitration agreement.” *Chan v. Charter Commc’ns Holding Co.*, 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015) (Bernal, J.). Such a relationship makes it “equitable to compel the nonsignatory to also be bound to arbitrate his or her claim.” *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008). “Examples of the preexisting relationship include agency, spousal relationship, parent-child relationship and the relationship of a general partner to a limited partnership.” *Id.* “Thus an arbitration clause often applies to the spouse and children of the signatory.” *Chan*, 2015 WL 12655701, at *5 (Bernal, J.).

Courts have consistently recognized the parent-child relationship as a paradigmatic example of a preexisting relationship that requires arbitration. In *S.G. v. Epic Games, Inc.*, 2025 WL 2447456, at *5 (N.D. Cal. Aug. 26, 2025), the court compelled arbitration of a non-signatory minor’s claims arising from the use of his father’s account to play the videogame Fortnite. The father consented to the license agreement and arbitration provision “for both of their benefit on the shared account,” and the father was “facilitating” the child’s gameplay. *Id.* The court concluded that the “preexisting relationship between S.G. and his father makes it ‘equitable’ to impose the duty to arbitrate upon S.G. even if he did not sign the EULA himself.” *Id.* The court emphasized that refusing to compel arbitration under these circumstances would allow individuals to “avoid contractual obligations governing the use of online accounts simply by having third parties create accounts and then using them as the Plaintiff did, even when the third parties maintained the accounts with the knowledge

and expectation that the plaintiff would use them." *Id.* (cleaned up).

Similarly, in *Yeh v. Tesla, Inc.*, 2023 WL 6795414, at *1 (N.D. Cal. Oct. 12, 2023), the court compelled arbitration of privacy claims brought by a one-year-old child whose father purchased a Tesla vehicle subject to an arbitration provision. The court concluded that the father's agreement to arbitrate extended to his son's claims as well, even though his son did not independently agree to arbitrate, because the "parent-child relationship is one such relationship" that "mak[es] it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." *Id.* at *7–8.

Other courts have applied the same principles to compel arbitration because of preexisting family and household relationships. In *Motise v. America Online, Inc.*, a child was bound by his stepfather's agreement because he accessed AOL's services solely through the stepfather's account. 346 F. Supp. 2d 563, 566 (S.D.N.Y. 2004). In *Chan*, both a spouse and children were bound to arbitrate under the husband/father's agreement. 2015 WL 12655701, at *5 (Bernal, J.). And in *Nicosia v. Amazon.com, Inc.*, a plaintiff who purchased through his wife's Amazon account was bound by the arbitration provision under equitable estoppel. 384 F. Supp. 3d 254, 258–59, 272 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020).

The same reasoning applies here. Plaintiffs used Roku devices and the streaming functionality of those devices through their mother's account, and Roku's terms apply to "anyone in your household that uses your account" and to all claims "arising out of or relating to your Roku account." Riediger Decl. ¶ 6, Ex. C at p.1, 5. In this context, the preexisting relationship between Plaintiffs and their mother makes it "equitable" to require Plaintiffs to arbitrate their claims.

**2. Direct-benefits estoppel: Plaintiffs received direct benefits by using their mother's account.**

Equitable estoppel also requires arbitration of Plaintiffs' claims because they directly benefited from their mother's Roku account. Courts routinely apply the doctrine of "direct benefits estoppel" to prevent a non-signatory from receiving the

benefits of a contract while seeking to avoid its obligations, including an arbitration requirement. *Corn v. Kohl's Corp.*, 2025 WL 1785943, at *1–2 (N.D. Cal. June 9, 2025); *Simple Traditions, Inc. v. Paychex, Inc.*, 2024 WL 4957225, at *6 (E.D. Cal. Dec. 3, 2024) ("The Ninth Circuit has repeatedly expressed that equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." (cleaned up)); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 431 (Del. Ch. 2007) ("Where a contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that one of the signatories is bound." (cleaned up)).

For example, in *Corn*, the non-signatory plaintiff was bound by her husband's arbitration agreement after she used his account to obtain rewards points, thereby receiving direct benefits from the contract. 2025 WL 1785943, at *1. In *Atencio v. Bird Rides Inc.*, a non-signatory mother was compelled to arbitrate personal-injury claims arising from her use of a scooter rented through her son's account, as she received the primary benefit of the rental agreement. 2023 WL 8168955, at *1–2 (C.D. Cal. Nov. 3, 2023) ("If it were not for Plaintiff's son entering into the agreement, the scooter could not have been unlocked or used."). Similarly, in *Hofer v. Emley*, a non-signatory passenger was required to arbitrate claims with a car-rental company because the passenger "knowingly received benefits flowing directly from the Agreement" and was a passenger in the car that his brother rented so they "*both* . . . could travel to visit family." 2019 WL 4575389, at *5–8 (N.D. Cal. Sept. 20, 2019) (emphasis in original). And in *Tesla*, the court compelled arbitration of the non-signatory child's claim because the signatory father purchased the vehicle intending that his child would benefit from the vehicle: "Yeh's purchase was, at least in part, to benefit and provide care for his child." 2023 WL 6795414, at *8.

The same principle applies here. Plaintiffs' claims arise solely because they received benefits from their mother's Roku account and agreement—specifically,

access to Roku devices, streaming content, and features such as voice-enabled controls. These are the core benefits conferred by a Roku account: "Your Roku account gives you access to certain device features and functionality, as well as access to streaming content from various content providers." Riediger Decl. ¶ 6, Ex. C at p.1. Absent these benefits, Plaintiffs would have no basis for their claims.

Plaintiffs' mother knew the Roku devices could be used by others in her household, and Plaintiffs allege they in fact used her Roku account. Direct-benefits estoppel therefore precludes Plaintiffs from enjoying Roku's products and services while attempting to avoid the obligation to arbitrate disputes arising from that use. *See Simple Traditions*, 2024 WL 4957225, at *6. Plaintiffs must therefore arbitrate their claims under the terms of the agreement from which they benefited.

### 3. Intertwined-claims estoppel: Plaintiffs' claims are intertwined with their mother's agreement with Roku.

Plaintiffs are also required to arbitrate because their claims are intertwined with their mother's agreement with Roku. Courts routinely compel non-signatories to arbitrate when their claims are "intertwined with the underlying contractual obligations." *Montoya v. Comcast Corp.*, 2016 WL 5340651, at *5 (E.D. Cal. Sept. 23, 2016); *Tesla*, 2023 WL 6795414, at *8 (compelling arbitration where minor's claims were "closely intertwined with the claims his father agreed to arbitrate"). A claim is considered "intertwined" when it relies on, or presumes the existence of, the contract's benefits or obligations. *Montoya*, 2016 WL 5340651, at *5.

Here, Plaintiffs' claims are inseparable from their mother's contractual relationship with Roku. Plaintiffs allege that their personal information was collected and disclosed while using Roku devices—activities that were possible only through Ms. Gonzalez's Roku account and her agreement with Roku. Compl. ¶¶ 48–49. Plaintiffs could not have accessed Roku's devices or services without Ms. Gonzalez's agreement to Roku's terms, which expressly require arbitration of all related disputes.

The reasoning in *Montoya* is directly on point. There, the plaintiffs (non-

signatory household members) used cable and internet services provided under another household member's service agreement with Comcast and alleged improper data collection. 2016 WL 5340651, at *1. The court compelled arbitration because the plaintiffs' claims arose from their use of Comcast's services under the agreement and were "intertwined with the contract because they [were] seeking to enforce the benefits of the contract (cable/internet services and protection of personal information) while simultaneously seeking to avoid the obligations of the contract (arbitration of disputes)." *Id.* at *6.

The same logic applies to Plaintiffs' claims. Those claims arise from their use of Roku devices and streaming, which are governed by the terms and arbitration requirement. Their claims cannot be separated from the contractual framework established by their mother's agreement with Roku.

**C. Equity and the FAA's policy compel the same result.**

The FAA's core purpose is to ensure "the enforcement of private agreements according to their terms." *AT&T Mobility LLC*, 563 U.S. at 344. Each equitable estoppel doctrine—preexisting relationship, direct benefits, and intertwined claims—serves that same purpose: preventing parties from unfairly accepting contractual benefits while avoiding the agreed arbitration forum for disputes.

Permitting individuals to sidestep arbitration simply by using another household member's account would undermine both the FAA's purpose and the foundation of modern online commerce. Businesses rely on predictable, enforceable user agreements to govern account-based access and dispute resolution. Declining to enforce arbitration agreements against non-signatory users who benefit from a signatory's account would create a loophole for avoiding contractual obligations, incentivize account sharing to evade terms, and frustrate the intent of these agreements. Non-enforcement would expose businesses to unpredictable litigation risks, reduce efficiency, and erode consumer protections and expectations. The integrity of contractual relationships depends on courts enforcing agreements

according to their terms and the parties' reasonable expectations. *See, e.g.*, *Epic Games*, 2025 WL 2447456, at *5; *Tesla*, 2023 WL 6795414, at *8. Principles of equity therefore require Plaintiffs' claims to be submitted to arbitration, consistent with the FAA's overarching goal of ensuring fairness, predictability, and respect for the parties' chosen forum.

**D. Arbitrability is delegated to the arbitrator.**

Because there is a valid agreement to arbitrate, the only remaining question is "whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d 1130. However, because the arbitration agreement delegates resolution of that issue to the arbitrator, there is nothing more for the Court to address. *See Henry Schein*, 586 U.S. at 69 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.").

**1. The terms delegate arbitrability to the arbitrator.**

Parties may delegate arbitrability in two ways: (1) by including an express delegation clause or (2) by incorporating the rules of an arbitral body that assign such authority to the arbitrator. *See Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) (express delegation); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (incorporation of arbitration rules). Both are present here.

First, Roku's current terms expressly provide that "the arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity." Riediger Decl. ¶ 7, Ex. D at § 1.E; *see also id.* ¶ 8, Ex. E at p.1 (2020 terms); *id.* ¶ 9, Ex. F at p.5 (2015 terms). This language "clearly and unmistakably" delegates arbitrability issues—including enforceability and scope—to the arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (finding clear and unmistakable intent to delegate question of arbitrability where contract provided the arbitrator with "exclusive authority" to resolve any dispute relating to the arbitration agreement); *Pearl v. Coinbase Glob., Inc.*, 2023 WL

1769190, at *3 (N.D. Cal. Feb. 3, 2023) (same).

Second, Roku's current terms incorporate the AAA Consumer Arbitration Rules, which expressly empower the arbitrator to decide issues of arbitrability: "[T]he rules applicable to Claims between you and Roku (the 'Applicable Rules') are the then-current version of the AAA's Consumer Arbitration Rules, as modified by these Dispute Resolution Terms." Riediger Decl. ¶ 7, Ex. D at § 1.E; *see also id.* ¶ 8, Ex. E at p.1 (2020 terms); *id.* ¶ 9, Ex. F at p.5 (2015 terms). Rule 7 of the AAA's Consumer Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of any claim or counterclaim." AAA Consumer Arbitration Rules, R-7(a). The Ninth Circuit and this Court hold that such "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130; *Marcos v. T-Mobile USA, Inc.*, 2024 WL 5673416, at *4 (C.D. Cal. July 10, 2024) (Bernal, J.) (citing same).

Because the terms—through both express delegation language and incorporation of the AAA Consumer Arbitration Rules—delegate arbitrability questions to the arbitrator, the Court "possesses no power to decide the arbitrability issue" and is required to compel arbitration. *Henry Schein*, 586 U.S. at 68.

### 2. Even if the terms did not delegate arbitrability, Plaintiffs' claims fall squarely within the agreement.

Even if the Court were to determine that the terms did not delegate arbitrability questions to the arbitrator (they did), the Court should conclude that Plaintiffs' claims fall squarely within the arbitration agreement. The Ninth Circuit has long held that to require arbitration, a plaintiff's factual allegations need only "touch matters" covered by the contract containing the arbitration clause. *Charles v. Portfolio Recovery Assocs., LLC*, 2024 WL 1672350, at *2 (9th Cir. Apr. 18, 2024); *Chan*, 2015 WL 12655701, at *3 (Bernal, J.).

Plaintiffs' claims plainly "touch matters" covered by the broad arbitration provision. The current terms require arbitration of all "Claims," defined to include "any dispute, claim, cause of action, or controversy between you and Roku, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, that arises from or relates to your Roku account, any of our products, software, or services (including any devices linked to your Roku account, whether or not owned by you), any advertising or promotions conducted by or for Roku, or any use or disclosure of your information or information about you." Riediger Decl. ¶ 7, Ex. D at § 1.A; *id.* ¶ 8, Ex. E at p.1; *id.* ¶ 9, Ex. F at p.4.

Plaintiffs allege that Roku "collected, and knowingly and intentionally disclosed to third-parties, . . . Plaintiffs' sensitive Personal Information" when they "access[ed], and use[d], multiple Roku enabled devices through their Guardian's Roku account, including a Roku streaming stick and multiple Roku TVs" to watch "child-directed content including content on the Kids and Family on the Roku Channel." Compl. ¶¶ 48–49. These privacy claims directly "arise from or relate to" their use of Roku devices and services and thus fall within the arbitration clause's express coverage of claims relating to the "use or disclosure of your information or information about you." Riediger Decl. ¶ 7, Ex. D at § 1.A.

* * *

In sum, Plaintiffs' claims are inseparable from their use of Roku's devices and services through their mother's account—an account bound by clear, enforceable arbitration terms. The Federal Arbitration Act and bedrock principles of equity require the same thing: those who take the benefits of an agreement must take its dispute-resolution terms too. To hold otherwise would undermine the predictability that arbitration promises and reward the kind of artful pleading courts have long rejected. Accordingly, the Court should compel arbitration and stay this action.[4]

[4] Consistent with Ninth Circuit authority, and out of an abundance of caution, if the Court does not grant Roku's motion to compel arbitration, Roku requests leave

## V. CONCLUSION

For the foregoing reasons, Roku respectfully requests that the Court compel arbitration and stay this action.

Dated: November 25, 2025

**PERKINS COIE LLP**

By: *s/ Eric J. Weiss*

Eric J. Weiss, *pro hac vice*
Mallory A. Gitt, *pro hac vice*
Gillian C. Kuhlmann, Bar No. 316241
Lauren Trambley, Bar No. 340634

Attorneys for Defendant Roku, Inc.

---

to conduct limited discovery to address arbitration. *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 833 (9th Cir. 2022) ("Here, PeopleConnect conditionally, and sufficiently, requested discovery in its motion to compel [arbitration]. Nothing required PeopleConnect to seek discovery first, and the district court never found (nor could it have) that PeopleConnect waived taking discovery. . . . [W]e have confirmed that the FAA's procedure mirrors the three phases of federal civil lawsuits: a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment, if the motion is denied; followed by a mini-trial, if necessary.").