JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 25-2474 JGB (DTBx)** | Date | February 6, 2026 |
| Title | *E.A.R.R., et al. v. Roku, Inc.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **Order (1) GRANTING Defendant's Motion to Compel Arbitration (Dkt. No. 27); and (2) VACATING the February 9, 2026 Hearing (IN CHAMBERS)**

Before the Court is defendant Roku, Inc.'s Motion to Compel Arbitration. ("Motion," Dkt. No. 27.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Petition, the Court **GRANTS** the Petition to Compel Arbitration, and **VACATES** the February 9, 2026 hearing.

## I. BACKGROUND

**A. Procedural Background**

On August 5, 2025, plaintiffs E.A.R.R. & E.A.R., by and through their guardian Lynette Gonzalez, (collectively, "Plaintiffs") filed a putative class action complaint against defendant Roku, Inc. ("Defendant" or "Roku") in California Superior Court, County of San Bernardino. ("Complaint," Dkt. No. 1-1.) Plaintiffs allege two counts: (1) violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.; and (2) violation of the California Invasion of Privacy Act, Cal. Pen. Code § 631(a), et seq. (Id. ¶¶ 65-111.) On September 19, 2025, Defendant removed this action to federal court. (Dkt. No. 1.) On November 25, 2025, Defendant filed this Motion. (Motion.) In support of the Motion, Defendant filed a declaration of Julian Riediger with attached exhibits. ("Riediger Decl.," Dkt. No. 27-1.) On December 23, 2025, Plaintiffs filed a memorandum in opposition to the Motion. ("Opposition," Dkt. No. 30.) On January 27, 2026, Defendant filed a reply in support of the Motion. ("Reply," Dkt. No. 31.)

B. **Relevant Factual Background**

A Roku account is necessary to activate and use the streaming functionality of Roku streaming sticks and Roku TVs, which are Internet-connected devices. (Riediger Decl., ¶ 2.) Roku has required, since at least 2015, that individuals who create a Roku account check a box confirming their agreement to Roku's terms. (Id. ¶ 3.) Those individuals must select a box confirming that they "agree to the Terms and Conditions." (Id., ¶ 4, Ex. A.) They can review the terms by selecting the hyperlinked language "Terms and Conditions." (Id.) If an individual attempts to create a Roku account without agreeing to the terms, they receive an error message that states: "To create a Roku account, you must agree to the Roku Terms and Conditions." (Id. ¶ 5, Ex. B.) Roku's Account Terms ("Terms") state that they "apply to all Roku products linked to your Roku account, and to anyone in your household that uses your account and/or any linked Roku products." (Id. ¶ 6, Ex. C at 1.) The Terms include a mandatory arbitration provision with a class-action waiver and incorporate dispute resolution terms. (Id. at 5.) Roku's dispute resolution terms have included a mandatory arbitration provision with a class-action waiver for more than a decade. (Id. ¶¶ 7-9, Ex. D-F.)

Roku most recently updated its dispute resolution terms in February 2024 ("Dispute Resolution Terms"). (Id. ¶¶ 7, 10, Ex. D.) Roku required accountholders to affirmatively assent to the updated terms. (Id. ¶¶ 10-11, Ex. G.) Roku also notified accountholders of the update via email. (Id. ¶ 12-13, Ex. H.) The Dispute Resolution Terms state that they:

> apply to all Claims between you and Roku, including those that arose before and after you accepted any version of these terms containing an arbitration provision. A "Claim" is any dispute, claim, cause of action, or controversy between you and Roku, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, that arises from or relates to your Roku account, any of our products, software, or services (including any devices linked to your Roku account, whether or not owned by you), any advertising or promotions conducted by or for Roku, or any use or disclosure of your information or information about you, or claims related to the arbitrability, validity, enforceability, or scope of any Roku consumer terms and conditions between you and Roku (including these Dispute Resolution Terms) or any portion of them.

(Id. ¶ 7, Ex. D at § 1.A.) They also require that claims "may be resolved only by binding individual arbitration conducted by American Arbitration Association." (Id. at § 1.E) "[T]he arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity." (Id.) Finally, the Dispute Resolution Terms allow an accountholder to opt out of arbitration by sending written notice within 30 days of agreeing to the Dispute Resolution Terms. (Id. at § 1.L.)

Plaintiffs access and use Roku-enabled devices, including a Roku streaming stick and multiple Roku TVs, through their guardian's Roku account. (Compl. ¶ 48.) Plaintiffs'

guardian is Lynette Gonzalez ("Guardian" or "Gonzalez").  (Id. ¶ 11.)  Roku's records do not indicate that Gonzalez opted out of the Dispute Resolution Terms.  (Riediger Decl., ¶ 14.)

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA establishes a general policy favoring arbitration agreements.  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011); Cox v. Ocean View Hotel Corp., 533 F.3d 1114, 1119 (9th Cir. 2008) ("Section 2 of the FAA creates a policy favoring enforcement of agreements to arbitrate.").  Its principal purpose is to "ensure that private arbitration agreements are enforced according to their terms."  Concepcion, 563 U.S. at 334 (citing Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ., 489 U.S. 468 (1989) (internal quotation marks omitted)).  "Arbitration is a matter of contract, and the [FAA] requires courts to honor parties' expectations."  Id. at 351.

Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such an arbitration proceed in the manner provided for in [the arbitration] agreement."  9 U.S.C. § 4.  Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration.  Id.  If such a showing is made, the district court shall also stay the proceedings pending resolution of the arbitration at the request of one of the parties bound to arbitrate.  Id. § 3.  On a motion to compel arbitration, a district court's involvement is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  Cox, 533 F.3d at 1119 (quoting Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000)).  A party seeking to compel arbitration under the FAA bears the burden of making this showing.  Id.  A determination on arbitrability is made "on the basis of the contract entered into by the parties."  Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241 (1962).

## III.   DISCUSSION

### A. The Arbitration Agreement

In deciding a motion to compel arbitration, a district court determines "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  Cox, 533 F.3d at 1119 (internal citations omitted).

The parties do not dispute that Gonzalez entered into a valid arbitration agreement with Roku.  (Mot. at 13-14; Opp. at 4-5.)  Rather, the parties dispute whether that arbitration agreement binds Plaintiffs.  (Opp. at 5-6.)  Defendant argues that equitable estoppel requires the Court to compel Plaintiffs' claims to arbitration.  (Mot. at 3.)  The Court first turns to

Defendant's argument that the parent-child relationship between Plaintiffs and Gonzalez categorically compels Plaintiffs' claims to arbitration. (Id.)

As this Court previously held, nonsignatories generally cannot be compelled to arbitrate. Chan v. Charter Commc'ns Holding Co., No. EDCV-15:0886-JGB-KKX, 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015) (quoting Crowley Maritime Corp. v. Boston Old Colony Ins. Co., 158 Cal. App. 4th 1061, 1065 (2008)). However, there exist certain exceptions:

> Under California law, a nonsignatory can be compelled to arbitrate . . . where "a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim."
>
> . . . Examples of the preexisting relationship include agency, spousal relationship, parent-child relationship and the relationship of a general partner to a limited partnership.

Id. (quoting Crowley Maritime Corp., 158 Cal. App. 4th at 1069-70).

Plaintiffs attempt to distinguish Chan by arguing that non-signatory arbitration cases relying on the parent-child preexisting relationship exception largely arise in the context of medical services. (Opp. at 9.) Plaintiffs point to In re Ring LLC Priv. Litig. where Judge Michael W. Fitzgerald distinguished Chan for failing to "address[] the distinction between contracts for medical services and adhesion contracts for consumer goods." (Opp. at 4 (citing No. CV-19:10899-MWF-RAOX, 2021 WL 2621197, at *8 (C.D. Cal. June 24, 2021)).) In In re Ring LLC Priv. Litig. Judge Fitzgerald held that the claims of twelve minor children, whose guardians had purchased and used Ring home security systems, were not bound by the arbitration clause in Ring's terms of services. 2021 WL 2621197, at *8. Judge Fitzgerald determined that California case law applying the parent-child preexisting relationship exception only applied to contracts by parents "for medical care or school activities" on behalf of their children. Id. He also found that applying the arbitration clause to any individual "who is knowingly or unknowingly surveilled by a Ring device," such as the children who were only "passively exposed" to the Ring devices, would lead to absurd and unjust results." Id. at *7.

Defendant responds that In re Ring LLC Priv. Litig. goes too far. (Reply at 5.) The Court agrees. Although one of the key cases cited to In re Ring LLC Priv. Litig. noted that the nonsignatory arbitration cases it analyzed were all "grounded in the authority of the signatory to contract for medical services on behalf of the nonsignatory," it did not purport to limit the applicability of the parent-child preexisting relationship exception to medical services cases. Cnty. of Contra Costa v. Kaiser Found. Health Plan, Inc., 47 Cal. App. 4th 237, 243 (1996), as modified (Aug. 1, 1996). Rather, the California Court of Appeal declined to compel the claims of the cross-complainants to arbitration because there was no preexisting relationship between the plaintiff, who had signed an arbitration agreement against the defendant, or the defendant and the cross-complainants. Id. at 244.

Moreover, federal cases decided since In re Ring LLC Priv. Litig. have forced the claims of minor children to arbitration under the parent-child preexisting relationship exception. In Yeh v. Tesla, Inc., a parent and his child brought claims against Tesla for failing to protect their privacy. No. 23-CV-01704-JCS, 2023 WL 6795414, at *1 (N.D. Cal. Oct. 12, 2023). After finding that a valid arbitration agreement existed and that it delegated questions of arbitrability to the arbitrator, Magistrate Judge Joseph C. Spero compelled the parent's claims to arbitration. Id. at *5-7. Judge Spero additionally compelled the child's claims to arbitration. Id. at *8. He distinguished In re Ring LLC Priv. Litig. on the facts and held that the doctrine of equitable estoppel applied because the minor child's parent's purchase of a Tesla "was, at least in part, to benefit and provide care for his child." Yeh, 2023 WL 6795414, at *8.

In S.G. v. Epic Games, Inc., the plaintiff, a minor, sued Epic Games, Inc., which moved to compel arbitration because the plaintiff used his father's account to play Fortnite, a game developed by Epic Games, Inc. 796 F. Supp. 3d 614, 618 (N.D. Cal. 2025). The plaintiff's father had accepted Epic Games, Inc's End User License Agreement, which contained an arbitration clause. Id. at 617-618. Judge Rita F. Lin held that the preexisting relationship between parent and child made it "equitable" to compel the plaintiff's claim to arbitration where plaintiff's father accepted the End User License Agreement multiple times during the period at issue and did so for the benefit of both the parent and the child. Id. at 621. To hold otherwise, Judge Lin reasoned, would allow individuals to "avoid contractual obligations governing the use of online accounts 'simply by having third parties create accounts and then using them as the Plaintiff did,' even when the third parties maintained the accounts with the knowledge and expectation that the plaintiff would use them." Id. at 621-22 (citing Motise v. America Online, Inc., 346 F. Supp. 2d 563, 566 (S.D.N.Y. 2004)).

In a similar case, Judge Stephen V. Wilson held that the plaintiff's voluntary use of Alexa compelled most of the plaintiff's claims against Amazon to arbitration on the basis of her preexisting relationship with her husband who had agreed to be bound by an arbitration clause in Alexa's terms of service. Tice v. Amazon.com, Inc., No. 5:19-CV-1311-SVW-KK, 2020 WL 1625782, at *3 (C.D. Cal. Mar. 25, 2020), rev'd and remanded, 845 F. App'x 535 (9th Cir. 2021).[1]

---

[1] Judge Wilson additionally held that the plaintiff's claim for surreptitious recording of her voice by an Alexa device could not be compelled to arbitration because Alexa allegedly recorded "conversations without any connection to the intended and advertised use of Alexa." Tice v. Amazon.com, Inc., No. 5:19-CV-1311-SVW-KK, 2020 WL 1625782, at *3 (C.D. Cal. Mar. 25, 2020). However, the Ninth Circuit reversed Judge Wilson and compelled plaintiff's claim for surreptitious recording to arbitration because the arbitration clause broadly applied to all claims related to Alexa, and not just those claims related to the "use" of Alexa. Tice v. Amazon.com, Inc., 845 F. App'x 535, 537 (9th Cir. 2021). Thus, the Ninth Circuit endorsed a broad application of the doctrine of equitable estoppel despite Judge Wilson's recognition that "it would be

Like Judge Spero in Yeh, the Court finds that the facts of this case are distinguishable from those in In re Ring LLC Priv. Litig. Here, Plaintiffs' conduct more closely approximates that of the plaintiff in S.G. Plaintiffs allege that they "have access to, *and use* . . . through their Guardian's Roku account" Roku devices. (Compl. ¶ 48 (emphasis added)). These Roku devices are "available in their household to view." (Id. ¶ 49.) Plaintiff's intentional use of Roku devices made available in their household is distinct from the passive exposure to Ring home security devices by the plaintiff minor children in In re Ring LLC Priv. Litig. 2021 WL 2621197, at *7. Instead, Plaintiffs' conduct more closely approximates that of the plaintiff in S.G., where the plaintiff's guardian created an account from which the plaintiff benefitted. 796 F. Supp. 3d at 621. At a minimum, Gonzalez's conduct in creating the Roku account and making the Roku devices available in Plaintiffs' household leads to the presumption that this conduct "was, at least in part, to benefit" Plaintiffs. Yeh, 2023 WL 6795414, at *8. On these facts, the Court agrees with Judge Lin that to not compel Plaintiffs' claim to arbitration under the doctrine of equitable estoppel would allow them to "avoid contractual obligations governing the use of online accounts." S.G., 796 F. Supp. 3d at 621 (internal citation omitted). This Court's conclusion is only reinforced by Roku's Terms, under which the accountholder agrees that the Terms, including the Dispute Resolution Terms, apply to "anyone in your household that uses your account and/or any linked Roku products." (Reidiger Decl. ¶ 6, Ex. C at 1.) Therefore, the Court holds that the arbitration agreement binds Plaintiffs under the doctrine of equitable estoppel because of their preexisting relationship with their Guardian. As a result, the Court need not consider Defendant's alternative arguments under the doctrine of equitable estoppel.

Finally, the Court must determine "whether the agreement encompasses the dispute at issue." Cox, 533 F.3d at 1119 (internal citations omitted). Because the arbitration agreement binds Plaintiffs and because the Dispute Resolution Terms provide "'clear and unmistakeable' evidence that 'the parties agreed to arbitrate arbitrability,'" Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1029 (9th Cir. 2022) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)), the Court finds that any question as to whether the Dispute Resolution Terms cover the dispute at hand is delegated to the arbitrator. (See Reidiger Decl., ¶ 7, Ex. D at § 1.E ("[T]he arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity.").) Accordingly, the Court **GRANTS** the Motion.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Compel Arbitration and **VACATES** the February 9, 2026 hearing. The Court **COMPELS** Respondent to arbitration and **STAYS** the case pending the outcome of any arbitration proceedings. The parties shall jointly notify the Court within seven days of the conclusion of arbitration, and shall

---

inequitable to bind a non-signatory to limitless terms in an adhesion contract based solely on her marital relationship with the signatory." Id. at 538 (Eaton, J. dissenting).

request that the Court dismiss this matter or take other action consistent with the resolution of the arbitration.  The Clerk is **DIRECTED** to administratively close the case.

    **IT IS SO ORDERED.**